J-A21031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ARI GOLDSTEIN | : | |
| | : | |
| Appellant | : | No. 2095 EDA 2020 |

Appeal from the Judgment of Sentence Entered October 21, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0005228-2018

BEFORE:   KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED DECEMBER 22, 2021**

Ari Goldstein ("Appellant") appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted him of indecent assault by forcible compulsion, attempted involuntary deviate sexual intercourse ("IDSI") by forcible compulsion, and attempted involuntary deviate sexual intercourse.  Sentenced to three and one-half to seven years' incarceration with a five year probationary tail, Appellant challenges the consolidation of sexual assault charges relating to separate incidents alleged by different complainants, the court's application of the Rape Shield Law, the court's evidentiary ruling as to the scope of cross-examination, the sufficiency of the evidence, and the constitutionality of Subsection H of the SORNA II statute.  After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

The Trial Court aptly sets forth the pertinent factual and procedural history, as follows:

> This case involves Appellant's alleged sexual assault of two adult female complainants, J.L. and R.F.  At the time of both incidents, all three individuals were undergraduate students at Temple University, and Appellant was president of the university's chapter of Alpha Epsilon Pi ("AEPi") (a college fraternity).  N.T., 2/13/20, at 7-8.  Members of AEPi, including Appellant, resided at the AEPi fraternity house on North Broad Street in Philadelphia.

> <u>CP-51-CR-0007533-2018, Complainant J.L.</u>

> At trial, J.L. (Complainant under Docket CP-51-CR-0007533-2018) testified to the following events.  At the time of the alleged conduct, J.L. was a member of AEPi's sister sorority, Alpha Epsilon Phi ("AEPhi").  N.T. 2/12/20 at 42.  J.L. maintained friendships with several members of AEPi, including Appellant, and she and her sorority sisters regularly frequented the AEPi house.  N.T. at 42, 46, 56.  Further, she and Appellant maintained a sexual relationship, and the two had engaged in consensual sexual contact "three or four" times before the incident at issue.  N.T. at 46.

> On the evening of November 29, 2017, members of AEPi invited the sorority to the AEPi house to "pregame"[fn] before going to campus bars around Temple University.  N.T. at 42.  J.L drank "two or three glasses of wine" at the AEPi house; she testified that she was "tipsy" but coherent.  N.T. at 43.  At some point, members of AEPi and AEPhi left the fraternity house and went to The Draught Horse, a bar located on Cecil B. Moore Avenue in Philadelphia.  N.T. at 43.  Appellant did not accompany the group to the bar.  N.T. at 48.

> ---

> [fn] To "pregame" is "to drink alcoholic beverages prior to a social engagement to make it more enjoyable." Pre-Game, URBAN DICTIONARY, https://www.urban dictionary.com/define.php?term=Pre-Game (last visited Feb.3, 2021).

> ---

Around 1:30 a.m., J.L. and two AEPi members, Matt Perel and Mitchell Pisarz, left the bar and went back to the AEPi house. Thirty minutes later, around 2:00 a.m., Appellant invited J.L. to his bedroom. (Id. at 48); (Comm. Ex. 9 at 2-3) (unpaginated). Appellant did not share the room with anyone, and J.L., who accepted the invitation, went to his room by herself. N.T. at 48-49. The two briefly spoke on Appellant's couch before engaging in consensual sexual intercourse. N.T. at 49. At some point, Appellant positioned himself on top of J.L. and pressed his hand on the area of her chest/collarbone, as he shoved the fingers of his other hand into her throat. N.T. at 50. The complainant struggled with him for "a couple of minutes" before she could manage to speak and demand that he stop. *Id.* J.L. testified that Appellant had never done that during their prior encounters, he did not obtain consent to do that on the evening in question, and the gesture scared her and caused her pain. N.T. at 50-51. She further testified that Appellant's actions caused her to sustain bruises on her arm and collar bone. N.T. at 61.

After J.L. told Appellant to stop, he asked her to perform oral sex on him. N.T. at 52. She testified that she briefly complied with his request, explaining, "I just figured it was an easy way to kind of . . . end the situation and get out of there as quickly as I could." *Id*. More specifically, J.L testified that she performed oral sex on Appellant for less than five seconds, before telling Appellant, "Stop, I don't want to do this anymore." *Id*. Appellant, who was still seated on his couch, responded, "No, don't stop," grabbed the back of J.L.'s head, and tried to push her mouth onto his penis. N.T. at 53. Even as J.L. cried, repeatedly told him "no," and begged him to stop, Appellant did not stop. *Id*. J.L tried to physically resist Appellant by pushing him away. N.T. at 54. The two struggled for a few moments, but J.L. eventually managed to break away from him. N.T. at 55, She stood up and said, "Can you fucking stop," before getting dressed and leaving Appellant's bedroom. *Id*.

### **CP-51-CR-0005228-2018, Complainant R.F.**

At trial, R.F. (Complainant under Docket CP-51-0005228-2018) testified as follows. On February 25, 2018, R.F. went to a party at the AEPi house with three friends. N.T., 2/12/20, at 138-139. R.F., a freshman at the time of the incident, testified that she had gone to the AEPi house almost every weekend since August of 2017. N.T. at 138. Before going to the party on February 25, R.F.

partially consumed a mixed drink consisting of vodka and Gatorade. N.T. at 139. She explained that she did not finish her drink and she was not intoxicated at the time of the alleged incident. N.T. at 140.

R.F. and her friends arrived at AEPi around 12:00 a.m. N.T. at 139. The group socialized and danced together for approximately forty-five to fifty minutes before Appellant approached R.F. and asked her if she wanted to go to his room to "smoke weed." N.T. at 141, 143. R.F. accepted the offer and followed Appellant to his bedroom on the third floor. N.T. at 144. No one accompanied the pair. N.T. at 144-45. When the two arrived, Appellant opened his door and R.F. walked inside. N.T. at 145. Appellant immediately grabbed R.F.'s wrist, locked his bedroom door, and pulled her to the couch. *Id*.

Once the two were seated, Appellant kissed R.F.'s mouth, as he maintained his grip on her wrist. N.T. at 147. She pulled away and told him, "Stop. I'm not here to do this." *Id*. Appellant replied, "Why else would you come upstairs with me?" *Id*. Appellant "pinned" R.F. on her back and continued to kiss her. *Id*. R.F. described the incident in detail, explaining that he held both of her hands above her head as he straddled her and pushed his knee into her left thigh. N.T. at 147-48. The complainant explained that she could not move, and she continuously "beg[ged] him to stop." N.T. at 148.

Appellant did not stop. N.T. at 148. Rather, he continued to kiss her mouth as he pulled at her shirt and bra, eventually exposing her left breast. *Id*. At some point, R.F. screamed and Appellant "let go for a second." N.T. at 150. R.F. managed to sit up, but "as soon as [she] sat back up," Appellant pushed her down and, again, pinned her hands above her head. *Id*. The complainant started to cry, scream, and "thrash" her body. N.T. at 151. Again, Appellant stopped for a brief moment. *Id*. He then grabbed her left arm and pulled her on top of him, before seizing and securing both of her hands and pushing her head "towards his crotch." N.T. at 152. As he pushed her head and "thrust his hips' towards her face, Appellant told her, "You know you want to do this. That's what you came up here for. Just do it." *Id*. Appellant continued to push his groin towards her face as he grabbed his belt buckle and indicated that he wanted her to unbuckle it. N.T. at 154. She repeatedly urged him to stop, but he laughed and ignored her pleas. N.T. at 152.

Eventually, the complainant managed to free her leg and kick Appellant. N.T. at 155-56. Appellant finally released his grip, and R.F. immediately ran out of his room. N.T. at 156. As she fled the attack, Appellant told her, "Don't tell anyone about this." *Id*. As a result of the incident, R.F. sustained a large bruise on her thigh. N.T. at 160.

R.F. testified that she did not report the incident to authorities until April of 2018 because she did not want her favorite fraternity to get into trouble due to the actions of "one bad seed." N.T. at 161. The complainant eventually disclosed the abuse after unexpectedly seeing Appellant on campus. N.T. at 162. The sighting caused R.F. to suffer a panic attack, and she reported the incident to police the following day. N.T. at 162-63.

. . .

On February 18, 2020, following a jury trial, [Appellant] was convicted [as noted, *supra*]. [The trial] sentenced Appellant . . . on October 21, 2020, to three and one-half to seven years' incarceration, followed by five years of probation.

As part of his sentence, Appellant was also ordered to comply with all Tier III sex offender obligations under the current Pennsylvania Sexual Offender Registration and Notification Act (SORNA II).[fn] At sentencing, counsel for Appellant raised an oral post-sentence motion for reconsideration, challenging the legality of his sentence under SORNA II. [The trial court] contemporaneously denied the motion.

---

[fn] 42 Pa.C.S.A. § 9799.10 *et seq*.

---

Appellant filed a timely notice of appeal on October 26, 2020, and on November 2, 2020, [the trial court] ordered him to file a statement of errors complained of pursuant to Pa.R.A.P. 1925(b). Appellant filed his 1925(b) statement on November 18, 2020. . . .

Trial Court Opinion, at 3-6, 1-2.

Appellant raises the following issues for our consideration:

I.      Did the trial judge abuse her discretion in granting the prosecution's motion for consolidation of two separate sexual offenses charged against the Appellant?

II.     Did the trial judge abuse her discretion by refusing to allow the defense to pierce the Rape Shield Statute to present evidence that R.F. had engaged in other sexual activity right after leaving the scene of the incident?

III.    Did the trial judge abuse her discretion in refusing to allow the defense to cross-examine the complainant regarding her nonsexual conduct immediately after the encounter with the Appellant?

IV.     Was the evidence insufficient to prove beyond a reasonable doubt that the Appellant was guilty of attempted involuntary deviate sexual intercourse and attempted sexual assault?

V.      Can SORNA II be constitutionally applied in this case where it violated Appellant's rights re [sic] *ex post facto* laws and due process of law?

Brief for Appellant, at 3.

We have carefully reviewed the certified record, party submissions, and the Rule 1925(a) opinion issued by the trial court. Based on our review, we conclude that the claims raised by Appellant are without merit and that the trial court has clearly, concisely, and accurately examined each of Appellant's assertions. Accordingly, we affirm Appellant's convictions and judgments of sentence for the reasons set forth by the trial court and adopt its February 5,

2021 opinion as our own.[1] Nevertheless, we provide the following review of Appellant's issues.

Appellant first posits that the trial court abused its discretion when it granted the Commonwealth's motion to consolidate J.L.'s and R.F.'s case. We note that "whether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice and clear injustice to the defendant." *Commonwealth v. Knoble*, 188 A.3d 1199, 1205 (Pa.Super. 2018) (citation omitted).

Similarly:

Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Tyson*, 119 A.3d 353, 357–58 (Pa. Super. 2015) (*en banc*) (citations omitted).

Appellant maintains that the evidence offered to prosecute one case would not have been admissible at a separate trial for the other because proof of one did not prove the other and he would have been found not guilty in each case had they been tried separately. He argues that consolidation thus

---

[1] Henceforth, the parties are directed to attach a copy of the trial court's opinion to each filing pertaining to our disposition in this appeal.

violated both Pennsylvania Rule of Criminal Procedure 582,[2] which allows

consolidation of separate informations only when evidence of each offense

_____

[2] **Rule 582. Joinder--Trial of Separate Indictments or Informations**, provides in pertinent part:

**(A) Standards**

> (1) Offenses charged in separate indictments or informations may be tried together if:

>> (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion;

. . .

**(B) Procedure**

> (1) Notice that offenses or defendants charged in separate indictments or informations will be tried together shall be in writing and filed with the clerk of courts. A copy of the notice shall be served on the defendant at or before arraignment.

> (2) When notice has not been given under paragraph (B)(1), any party may move to consolidate for trial separate indictments or informations, which motion must ordinarily be included in the omnibus pretrial motion.
> . . .

> *Comment:* Ordinarily offenses or defendants charged in separate indictments or informations will be tried separately. Under the scheme set forth in this rule, it can be assumed that offenses charged in the same indictment or information will be tried together. *See* Rule 563. Similarly, offenses or defendants will be tried together if written notice is served pursuant to paragraph (B)(1) of this rule. In these situations, the court may order separate trials either when the standards in paragraph (A) are not met or pursuant to Rule 583. Absent joinder in the same indictment or information or absent written notice pursuant to

*(Footnote Continued Next Page)*

would be admissible in a separate trial for the other and is capable of separation by the jury with no danger of confusion, and Rule 583,[3] which permits separate trials even when consolidation would otherwise be proper under Rule 582 if it appears the defendant may be prejudiced by consolidating the offenses.

Specifically, Appellant assigns error with the court's determination that the two alleged assaults reflected a "common plan, scheme, or design" that warranted consolidation. He points to the distinctions between the two cases, namely: J.L knew Appellant well and had prior consensual sexual relations

---

paragraph (B)(1), a motion for consolidation is required under paragraph (B)(2). A party may oppose such a motion either on the ground that the standards in paragraph (A) are not met, or pursuant to Rule 583.

. . . .

Pa. R. Crim. P. 582

[3] **Rule 583. Severance of Offenses or Defendants**, provides in pertinent part:

The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

*Comment:* This rule provides the procedure whereby the court may, because of prejudice to a party, order separate trials of offenses or defendants that otherwise would be properly tried together under Rule 582. A defendant may also request severance of offenses or defendants on the ground that trying them together would be improper under Rule 582.

Pa. R. Crim. P. 583

with him, while R.F. was only familiar with Appellant on the night of her alleged assault; J.L voluntarily entered Appellant's room while R.F. claimed Appellant lured her into the room under false pretenses; J.L acknowledged that her alleged assault was prefaced by consensual sex before Appellant allegedly became aggressive and the encounter morphed to nonconsensual, whereas R.F. claimed the entire sexual interaction was nonconsensual; and, J.L. claimed Appellant forcibly inserted his fingers down her throat while pressing hard on her collarbone, but R.F. did not describe this particular conduct in her case.

Moreover, Appellant argues that only where the identity of the perpetrator in a sexual assault case is at issue is consolidation permitted. Under the present facts, where identity is not at issue, Appellant contends that admission of an alleged other bad act should have been limited to the procedure governed by Pa.R.Crim.P. 404(b),[4] pertaining to uncharged bad acts.

---

[4] Section 404(b)(1) provides:

(b) Crimes, Wrongs or Other Acts.

(1) Prohibited Uses.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

Pa.R.E. 404(b)(1).

In this respect, Appellant asserts that the probative value of evidence from either case to the other case was "outweighed by the prejudicial effect of leaving the jury with the impression that [Appellant] should not be allowed to walk away free as he may be worthy of condemnation as a sexual predator." Brief for Appellant at 22 (citing *Commonwealth v. Tucker*, 2017 WL 3484321 (Pa. Super. 2017) (courts guard against evidence of other crimes that might demonstrate bad character or propensity to commit crimes)). This was so, he continues, because the ample availability of witnesses for each case necessarily diminished the probative value of the other case evidence, particularly in R.F.'s case, where witnesses testified they either knew of R.F.'s account of her assault—including her bruising—or witnessed first-hand her expression of shock and fear as she left the fraternity.

Had consolidation not been allowed, Appellant concludes, he would have been acquitted in both cases, not just one. He, thus, requests a new trial, as he maintains the decision to consolidate represented an abuse of discretion.

In response, the Commonwealth rejects the proposition that separate trials were required below. Under Rules of Criminal Procedure 582 and 583, the Commonwealth observes, consolidation was proper because evidence of each case would be admissible in a separate trial for the other to show Appellant's common plan, scheme, or design, and there was no danger of confusing the jury when each witness confined his or her testimony to one complainant and the two episodes were clearly distinct in time. Indeed, the Commonwealth adds, the claim of unfair prejudice was belied by the jury's

- 11 -

ability to discern between the two, as demonstrated by its verdict of acquittal in J.L.'s case and of conviction in R.F.'s case.

To dispute Appellant's claim that consolidation is permitted only where the identity of the perpetrator is in question, the Commonwealth discusses decisional law affirming consolidation under the rules "to show a common plan, scheme or design embracing commission of multiple crimes, **or** to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others."  Commonwealth's Brief of Appellee, at 11 (quoting **Commonwealth v. Andrulewicz**, 911 A.2d 162, 168 (Pa.Super. 2006) (emphasis added).  Such a showing is made, the Commonwealth continues, where "there are shared similarities in the details of each crime." Commonwealth's Brief at 11. (quoting **Andrulewicz**, 911 at 168).

Compelling similarities between the two cases, the Commonwealth argues, called for the consolidation below.  On this point, the Commonwealth adopts the opinion of the trial court, which addresses such similarities in its Pa.R.A.P. 1925(a) Opinion, as follows:

> Despite the differences noted above [Appellant's ongoing sexual relationship with J.L compared with his passing familiarity with R.F; incident with J.L beginning with consensual vaginal intercourse whereas no form of intercourse preceded incident with R.F.], the significant similarities between Appellant's criminal episodes warrant admission under Rule 404(b) and consolidation under Rule 582(A)(1)(a).
>
> First, there are remarkable similarities between the individual complainants.  Both women are close in age (R.F. was eighteen and J.L. was twenty-one at the time of the alleged conduct) (N.T. 2/12/20 at 41, 170); both complainants are white, female, and

notably petite (N.T. at 148), (N.T. 2/14/20 at 31), and (Comm. Mot. at 5) (unpaginated); at the time of the underlying incidents, both complainants were undergraduate students at Temple University (N.T. 2/12/20 at 41, 137); both complainants were familiar with Appellant and frequently attended parties and other social gatherings at the AEPi house (N.T. at 42, 128); and, on the respective days in question, both complainants were guests in Appellant's home immediately before the underlying criminal conduct. (N.T. at 42, 139).

The particular way in which Appellant committed the crimes is also markedly similar:[fn]

---

[fn] During his closing statement, defense counsel even remarked on the notable similarity between the two cases, stating that the allegations were so similar that they seemed "concocted." N.T. 2/14/20 at 42.

---

1. Appellant invited both women to his bedroom and attacked them while they were alone with him. N.T. 2/12/20 at 47-48, (Comm. Ex. 9) (asking J.L to "[c]ome here" to his bedroom); N.T. at 143 (approaching R.F. and asking her to go to his bedroom to smoke).

2. Both complainants testified that Appellant engaged in shockingly aggressive conduct immediately before indicating that he wanted oral sex. J.L. testified that Appellant pinned her against the couch and shoved his fingers into her throat, before asking her to perform oral sex on him (N.T. at 50-51). R.F. testified that Appellant pinned her back to the couch, exposed her left breast, and bit her, moments before he commanded her to "give [him] head." N.T. at 149, 199.

3. Each woman testified that Appellant put his hand on the back of her head and pushed her head towards his penis. N.T. at 53, 152.

4. Both complainants cried and repeatedly begged Appellant to stop; Appellant ignored them both. N.T. at 53, 147-48, 151-52. Appellant used physical force to overpower both women

as they tried to resist him and push him away. N.T. at 53-55, 147-156.

5. Both encounters ended only when the women—after significant struggle—managed to partially or completely break free from Appellant's grip. N.T. at 55, 156.

6. The situs of both incidents is precisely identical; Appellant assaulted both complainants on the couch in his bedroom. N.T. at 49-52, 145-47.

7. Finally, both incidents occurred during early morning hours (J.L. around 2:00 a.m. and R.F. around 1:00 a.m.). N.T. at 48, 139-41.

These matching characteristics are not trivial details, and they are not limited to the "essential elements" of the alleged crimes. **See Frank**, 577 A.2d at 614. Rather, they indicate a unique pattern that distinguishes Appellant's actions from the actions of other sexual assailants. **See Hughes**, 555 A.2d at 1283 (admitting evidence of a prior rape at a rape-murder trial where the two victims were three years apart in age, the crimes occurred during the day in a similar manner). Accordingly, [the trial court] determined that the incidents were highly probative of Appellant's common scheme to invite his female peers to his bedroom, violently attack them, and force them to engage in oral intercourse. . . . .

Moreover, consolidation in this case was not unduly prejudicial. Unfairly prejudicial evidence is any evidence having a "tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 cmt. All relevant Commonwealth evidence is prejudicial to a defendant. **Commonwealth v. Broaster**, 863 A.2d 588, 592 (Pa.Super. 2004). Therefore, exclusion is limited to evidence that is **unduly** prejudicial—namely, evidence that is "so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." **Commonwealth v. Antidormi**, 84 A.3d 736, 750 (Pa.Super. 2014) (citing **Commonwealth v. Owens**, 929 A.2d 1187, 1191 (Pa.Super. 2007).

- 14 -

Here, consolidation did not confuse the jury, "inflame" the jury's sensibilities, or lead them to convict on an improper basis. Rather, the jury clearly demonstrated its ability to both separate the evidence presented under each docket and weigh that evidence independently, as evidenced by the fact that the jury rendered a verdict of "not guilty" under Docket 7533 but "guilty" under Docket 5228. N.T. 2/18/20 at 9-10.

Moreover, in delivering its final charge, [the trial court] included a cautionary instruction about the consolidation:

> As I instructed you earlier, the defendant is on trial for two separate cases in which he is alleged to have committed related offenses on different dates. With respect to each individual case, you must weigh the evidence, follow my instructions on the law, and determine whether the Commonwealth has met its burden that the defendant is guilty beyond a reasonable doubt. . . . With respect to each individual case, you may consider evidence of the other case for the following purposes: [t]o determine whether the defendant was acting in conformity with a common plan, scheme, or design; to assess the credibility of the complainant; to determine whether the complainant gave consent; to [] complete the story of the defendant's action or the history and development of these cases.
>
> **With respect to each individual case, you should not consider evidence of the other alleged sexual assault for any other purpose than for those that I just stated. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you must be inclined to infer guilt.**

N.T. 2/14/20 at 110-11 (emphasis added).

[This court] expressly cautioned the jury not to regard the evidence as proof that Appellant was a person of bad character or of criminal tendencies. *Id*. It is well settled that a jury is presumed to follow a trial court's instructions. ***Commonwealth v. Cash***, 137 A.3d 1262, 1280 (Pa. 2016). Thus, any potential for **unfair** prejudice was tempered by [the trial] court's

- 15 -

instruction. Moreover, the probative value of the evidence significantly outweighed its prejudicial impact—especially in light of the fact that each case relied on circumstantial evidence and/or uncorroborated testimony of a single witness. . . . .

TCO, at 11-14.

After consideration of the foregoing authority and jurisprudence discussed, *supra*, we discern no reason to disturb the trial court's ruling to consolidate the two complaints. Importantly, cases need not be identical for consolidation, **see Commonwealth v. Tyson**, 119 A.3d 353, 360 n.3 (Pa. Super. 2015) (*en banc*) (admitting common plan evidence of sexual assaults where victims entered the accused's home under different circumstances), and the significant similarities between the two cases herein supported their joinder.

Specifically, the similarities went beyond mere generalities, as each case comprised allegations of forcible, unwanted sex facilitated by Appellant's use of an unexpected and overwhelming physical restraint of a petite, young, female college student who was, at a minimum, a familiar guest of the fraternity invited by Appellant into his room. Moreover, the two incidents occurred within one month's time during the same school semester, and the lack of corroborating witnesses only enhanced the probative value of each case's facts to the other case. Accordingly, as we concur with the trial court's rationale in favor of consolidation, we discern no reason to disturb its ruling consolidating the two cases below.

Next, Appellant claims that the trial court abused its discretion by denying the defense motion to pierce the Rape Shield Law[5] with evidence that R.F. had engaged in consensual sex with a male friend, Brian Trev, at his home shortly after she allegedly fled from Appellant's bedroom and left the AEPi house on the night in question.

The purpose of the Rape Shield Law has been explained, as follows:

> To summarize, [the Rape Shield Law] is intended to "prevent a trial from shifting its focus from the culpability of the accused towards the virtue and chastity of the victim." **Commonwealth v. Allburn**, 721 A.2d 363, 366-67 (Pa. Super. 1998) (internal quotation marks and citations omitted). This protective measure is salient where defendants attempt to utilize evidence of the complainant's alleged promiscuity to bolster their claim of consent. **See**, **e.g.**, **Commonwealth v. Widmer**, 446 Pa. Super. 408, 422, 667 A.2d 215, 222 (1995), *rev'd on other grounds*, 547 Pa. 137, 689 A.2d 211 (1997). Thus, the shield law "prevent[s] a sexual assault trial from degenerating into an attack upon the victim's reputation for chastity." **Commonwealth v. Berkowitz**, 537 Pa. 143, 151, 641 A.2d 1161, 1165 (1994) (citing cases).[] It additionally removes obstacles to the reporting of sex crimes. **Accord Williams v. State**, 681 N.E.2d 195, 200 (Ind. 1997).
>
> With that said, the shield law may not be applied in a manner that violates a defendant's constitutional right to a fair trial, including his right to present evidence and cross-examine witnesses. **See Spiewak**, 533 Pa. at 11, 617 A.2d at 701 ("Notwithstanding these worthy legislative aims, rules excluding evidence cannot be mechanistically applied to abridge a defendant's right of confrontation by denying admission of highly reliable and relevant evidence critical to his defense."). In this regard, the Sixth Amendment and Article I, Section 9 of the state Charter both protect a defendant's right to be confronted with adverse witnesses. **See** U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted

---

[5] 18 Pa.C.S.A. § 3104.

with the witnesses against him[.]); PA. CONST. art. I, § 9 (same). The federal right to "be confronted with" such witnesses has been incorporated to the States and includes the right to conduct reasonable cross-examination. *See Olden v. Kentucky*, 488 U.S. 227, 231, 109 S. Ct. 480, 483, 102 L.Ed.2d 513 (1988) (*per curiam*); *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Commonwealth v. Williams*, 624 Pa. 183, 189, 84 A.3d 680, 684 (2014).  This is true of the state provision as well.  *See Commonwealth v. Gribble*, 550 Pa. 62, 83-84, 703 A.2d 426, 437 (1997), *abrogated on other grounds*, *Commonwealth v. Burke*, 566 Pa. 402, 413, 781 A.2d 1136, 1142 (2001).[]

At the same time, the confrontation right is not absolute. It guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 559, 108 S. Ct. 838, 842, 98 L.Ed.2d 951 (1988) (internal quotation marks and emphasis omitted).  Thus, trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

. . .

As reflected in the cases reviewed above, the circumstances in which Pennsylvania courts have admitted evidence notwithstanding the shield law involve proofs offered to demonstrate factual premises other than consent – such as that the conduct was committed by someone other than the defendant, the complainant harbored bias and hostility toward the defendant which would induce him or her to fabricate or color testimony, or that the complainant otherwise had an ulterior motive to manufacture charges.

*Commonwealth v. Rogers*, 250 A.3d 1209, 1215–17, 1220 (Pa. 2021)

Relying primarily on *Commonwealth v. Palmore*, 195 A.3d 291

(Pa.Super. 2018) (holding Rape Shield Law does not preclude sexual history

admitted for impeachment or exculpatory purposes), the defense argued at trial that evidence of R.F.'s encounter with Mr. Trev was relevant and admissible to impeach R.F.'s credibility about the source of bruising to her thigh—which she attributed to Appellant's assaultive actions—and to show her conduct was inconsistent with having just been sexually assaulted and traumatized at the AEPi house.

The trial court concluded that R.F.'s unrelated sexual conduct later that night neither impeached her testimony against Appellant nor tended to exculpate him. In reaching its decision, the trial court conducted a three-prong balancing test pursuant to **Commonwealth v. Black**, 487 A.2d 396 (Pa.Super. 1985), which requires trial courts confronted with a motion to pierce the Rape Shield Law to consider "(1) whether the proposed evidence is relevant to show bias or motive or to attack credibility; (2) whether the probative value of the evidence outweighs its prejudicial effect; and (3) whether there are alternative means of proving bias or motive or to challenge credibility." **Id**. at 401. **See also Commonwealth v. Jerdon**, 229 A.3d 278, 286 (Pa.Super. 2019) ("Evidence of a claimant's sexual history may be admissible if 'the evidence is relevant to exculpate the accused, more probative than prejudicial, and non-cumulative in nature.'").

As to the first prong, the trial court "found no factual or logical nexus between R.F.'s sexual contact with Mr. Trev and her alleged bias and/or motivation to fabricate allegations against Appellant." Trial Court Opinion, 2/5/21 at 19.

The court thus distinguished the present case from *Palmore*, in which the sexual history evidence sought to be introduced related directly to the defense theory that complainant fabricated her sexual assault claim to discredit defendant's report to complainant's boyfriend that he had seen her perform oral sex on his roommate. *Id.* at 298 (observing a reasonable inference that boyfriend would be less receptive to defendant's report upon hearing complainant's accusation, thus giving defendant's fabrication theory a "plausible" and" logically consistent" foundation favoring admissibility of sexual history evidence). Identifying in Appellant's motion neither a similar specific theory to support admission nor a logical link between R.F.'s sexual history and her accusation here, the trial court found the first prong of the *Black* test unmet.

Nor did the second prong inquiry favor admission, the trial court continued, where the evidence of R.F.'s sexual conduct later that evening had no probative value to R.F.'s veracity and would have been unfairly prejudicial. Appellant had argued that the evidence was highly probative because it presented a plausible alternate cause of her bruising and was conduct inconsistent with a newly traumatized sexual assault victim.

The trial court disagreed, noting:

> The Rape Shield Law is "a bar to admission of testimony of prior sexual conduct involving a victim, . . . **unless it has probative value which is exculpatory** to the defendant." *Commonwealth v. Johnson*, 566 A.2d 1197, 1202 (Pa.Super. 1989), *aff'd* 638 A.2d 940 (Pa. 1994). Evidence of a victim's sexual history is only exculpatory if it "**directly negates** the act .

. . . with which the defendant is charged." ***Commonwealth v. Beltz***, 829 A.2d 680, 684 (Pa.Super. 2003) (citation omitted) (emphasis added)). If the evidence only shows "that others . . . had sexual contact with the victim, but does not show how the evidence would exonerate the defendant, evidence of prior sexual activity is inadmissible under the Rape Shield Law." ***Fink***, 791 A.2d at 1242-43 (emphasis added).

. . .

Appellant argues that evidence of R.F.'s unrelated sexual contact is exculpatory because it was relevant to show that her bruise "could have been imposed by [Mr. Trev]." N.T. 3/14/19 at 14; see also Def. Mot. at 2, July 25, 2019. However, R.F.'s consensual sexual contact with Mr. Trev is in no way determinative of whether Appellant engaged in the alleged criminal conduct. Like the evidence in ***Beltz***, the evidence in the instant case does not provide a differing account of the same event, such that it can "directly negate" Appellant's charges. ***See Beltz***, 829 A.2d at 685 [citation omitted]. Rather, Appellant's proffered evidence describes an entirely distinct incident and is only relevant to show that R.F. had physical contact with a person other than Appellant— a fact which, by itself, does not exonerate him. ***See id***.

Further, injury or bruising—although potentially indicative of the degree of physical force exerted by an assailant—are not elements of any of the alleged crimes,[] and a lack of injury does not constitute a defense to any of the same or prove that forceful physical contact did not occur. Thus, even if evidence of the complainant's sexual contact conclusively proved that Appellant did not cause her bruise, that fact would not "directly negate" or exculpate him of any charge.

. . .

Appellant further claims that evidence of R.F.'s consensual encounter with Mr. Trev was 'inconsistent with the expected behavior" of a sexual assault victim. (Def. Mot. at 2, July 25, 2019). . . . In his underlying memorandum, Appellant supported his argument with the Supreme Court of Pennsylvania's decision in ***Commonwealth v. Killen***, 680 A.2d 851 (Pa. 1996).

. . .

[**Killen**] noted the difference between sexual conduct and sexually suggestive statements and found that the [complainant's] statements [directed to a first responder assisting in her transport to a hospital immediately after her alleged sexual assault at the hands of a police officer] although sexual in nature, were not barred by the Rape Shield Law:

> The proffered testimony in the case *sub judice* **does not reference in any way the complainant's past sexual conduct** as proscribed by § 3104(a); rather, **the statements evidence the complainant's state of mind shortly after (and by implication during) her alleged sexual assault and are therefore relevant** and admissible to impeach her credibility. The Rape Shield Law was not designed to exclude evidence of a victim's statements to persons which are part of and relevant to the **ongoing episode** in which alleged criminal activity takes place. The fact that statements are sexually provocative in content does not automatically bring them within the protective purview of the Rape Shield Law.

*Id.* at 854 (emphasis added).

There are critical differences between **Killen** and the case at bar. Most notably, the proffered evidence in the case sub judice **directly references the complainant's past sexual conduct—not mere statements—as expressly proscribed by § 3104(a)**. Further, the evidence in **Killen**, provided a plausible, logical nexus between the proffered testimony and the defendant's allegation of victim fabrication; the evidence, therefore, was relevant to attack the complainant's credibility. **See id**. As this court explained herein, Appellant's claim of fabrication is not similarly tethered to plausibility or logic.

Moreover, the **Killen** court found that the victim's statements, given shortly after the incident, were relevant to the "ongoing episode" of alleged assault. Here, R.F.'s subsequent sexual contact is a completely disconnected event. It is not a part of the alleged episode of criminal activity, and it is therefore not relevant to show her "state of mind shortly after (and by implication during) her alleged sexual assault," as contemplated by **Killen**.

A more timely and analogous account of R.F.'s state of mind during the "ongoing episode" of alleged criminal activity can be inferred from the testimony of Casey Miller ("Miller"). At trial, Miller explained R.F.'s demeanor immediately after she left Appellant's bedroom, explaining that the complainant looked "extremely frightened." N.T. 2/13/20 at 73. Miller further stated, "[R.F.'s] eyes were big like she just saw a ghost. She looked terrorized and like she just wanted to get out of there." *Id*. When Miller asked R.F. is she was okay, she said, "no" and told Miller that Appellant had hurt her. *Id*.

Thus, as the proposed evidence describes an entirely distinct incident, it is irrelevant to demonstrate R.F.'s state of mind or attack on her credibility on this ground.

. . .

Finally, . . . the proposed evidence is profoundly prejudicial to the complainant, and this court justly excluded it.

Appellant's justification for piercing the Rape Shield is grounded in the exact type of misleading, chastity-based moral derision that the Rape Shield Law seeks to prevent. [The trial court opinion then catalogues numerous passages in Appellant's argument in which he contends the complainant's story is not believable because her decision to engage in sexual activity later that evening was "inconsistent with the expected behavior of a person who has alleged to have been the victim of violent sexual assault[.]"].

. . .

Appellant evidently wanted the jury to conclude that hours after the alleged assault, R.F. failed to present—what he considers to be—a satisfactory display of emotional trauma, and any victim who does not behave according to his (or perhaps society's) "expectations" must be lying.

. . .

In essence, Appellant intended to foster a single impermissible inference—namely, that a complainant's credibility can be determined by nosing through and appraising her sexual history.

The Rape Shield Law is specifically designed to prevent such an unacceptable result. *See Burns*, 988 A.2d at 689.

TCO at 24-28.

Finally, consistent with the third prong of the *Black* test, the trial court conducted an inquiry into the availability of alternative means of proving complainant's bias or motive, or of challenging her credibility. *See Black*, 487 A.2d at 401. It concluded that excluding Appellant's proposed evidence as required under the Rape Shield Law did not prevent Appellant's ability to challenge R.F.'s credibility through lawful means such as offering relevant and material evidence to undermine her disposition for truthfulness, to show her bias, interest, or corruption, to prove defects in her perception or recollection, and to contradict her testimony.

In this vein, the court noted that Appellant's cross-examination of R.F. was permitted to underscore inconsistencies between her preliminary hearing testimony and trial testimony and to challenge her ability to recollect events accurately given the amount of alcohol she drank, relative to her size, on the night in question.

Our review of the record in light of pertinent authority leads us to conclude that the trial court excluded evidence of R.F.'s past sexual conduct with Mr. Trev in harmony with established precedent and, thus, did not violate Appellant's sixth amendment rights to confrontation and cross-examination. Accordingly, we reject Appellant's challenge to the court's exclusion of evidence under the Rape Shield Law.

In Appellant's third issue, he contends that the trial court improperly limited the scope of his cross-examination of R.F. regarding her activities after leaving the frat house. Specifically, R.F. testified she left alone by Uber ride at 1:30 a.m., despite having attended the frat party with her female friend Casey Miller. Defense counsel then asked R.F. to confirm that the Uber took her somewhere other than her own home, but the trial court sustained the Commonwealth's relevance-based objection grounded, again, in the Rape Shield Law.

Not to be deterred by the court's ruling, defense counsel still implied that R.F. may have engaged in sexual conduct in the relevant time frame when he asked R.F., "Well, you actually -- I'm talking about sex now. I'm just asking a question. You actually could have gotten this bruise from someone else right?" N.T. at 205. The court, again, sustained the Commonwealth's objection for lack of relevance. Counsel then followed by asking R.F. to confirm that when she woke up the next morning and saw the bruise on her leg, she was not home. *Id*. When the court sustained the objection to that question, counsel asked, "Well, when was the next time you were back in your – where you lived?", to which the same objection was sustained. *Id*.

> Our Supreme Court has recognized that "[t]he Sixth Amendment guarantees criminal defendants the right to confront and cross-examine adverse witnesses" in order "to ensure a fair and reliable trial." *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 630 (2010); U.S. Const. amend. VI (additional citations omitted). "Cross-examination may be employed to test a witness' story, to impeach credibility, and to establish a witness's motive for testifying." *Commonwealth v. Ballard*, 622 Pa. 177, 80 A.3d

380, 394 (2013) (quoting ***Commonwealth v. Chmiel***, 585 Pa. 547, 889 A.2d 501, 527 (2005) (citation omitted)). "A trial court has discretion to determine both the scope and the permissible limits of cross-examination. The trial judge's exercise of judgment in setting those limits will not be reversed in the absence of a clear abuse of that discretion, or an error of law. ***Commonwealth v. Briggs***, 608 Pa. 430, 12 A.3d 291, 335 (2011) (quotations and citations omitted).

***Commonwealth v. Woeber***, 2017 PA Super 353, 174 A.3d 1096, 1103 (2017).

The gist of Appellant's claim is that questions put to R.F. and Ms. Miller asking of R.F.'s whereabouts after she left the frat house had the purpose of revealing to the jury "R.F.'s state of mind in view of her involvement with this other male immediately after the alleged incident." Brief of Appellant at 40. Appellant draws a parallel to the evidence introduced in J.L.'s case, where the Commonwealth elected to present testimony of a male friend who informed the jury that J.L. spent a comforting, platonic night in bed with him after her assault. Just as the jury rejected the Commonwealth's prosecution of the J.L. case, Appellant reasons, so too may it have rejected the R.F. case had it learned of her subsequent behavior with Mr. Trev, which Appellant maintains was inconsistent with the expected behavior of a sexual assault victim.

Despite Appellant's attempt to distinguish this issue from the previous one challenging the court's application of the Rape Shield Law to exclude R.F.'s activity with Mr. Trev, we perceive no meaningful distinction that would place this subject matter outside the scope of the Rape Shield Law. Appellant argues that R.F.'s state of mind immediately after the alleged incident was

highly probative to assessing the credibility of her accusation, but he sought to reveal her state of mind by reference to the very encounter with Mr. Trev which the trial court had properly excluded pursuant to the Rape Shield Law. The objection to Appellant's cross-examination of R.F. on this point, therefore, was properly sustained.

Furthermore, testimony regarding J.L.'s nonsexual night with her male friend did not implicate the Rape Shield Law and, thus, its admission into evidence had no bearing on the admissibility of R.F.'s encounter with Mr. Trev. As Appellant presents no argument or relevant decisional law to support his conclusion to the contrary, we find this claim meritless.

Appellant's fourth claim goes to the sufficiency of the evidence offered to prove attempted involuntary deviate sexual intercourse and attempted sexual assault. The standard of review for a challenge to the sufficiency of the evidence is well settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be

considered. Finally, the [trier] of fact while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011) (citations omitted).

A conviction of IDSI requires proof that the defendant engaged in "deviate sexual intercourse" with the complainant "by forcible compulsion." 18 Pa.C.S. § 3123(a)(1). Deviate sexual intercourse is defined as:

> Sexual intercourse per os or per anus between human beings .... The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures.

18 Pa.C.S. § 3101. A defendant commits the lesser included offense of sexual assault if he "engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S. § 3124.1.

Section 901 of the Crimes Code provides the following definition of "criminal attempt": A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime. 18 Pa.C.S.A. § 901(a). "The elements of criminal attempt are: (1) an intent to commit a specific crime; and (2) any act constituting a substantial step toward the commission of that crime." *Commonwealth v. Zingarelli*, 839 A.2d 1064, 1069 (Pa. Super. 2003). "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts

remaining to be done before the actual commission of the crime." **Id.** (citation omitted).

Appellant contends that even if one accepts as true R.F.'s testimony regarding Appellant's conduct, such evidence may have established his *intent* to commit the acts for which he was charged, but it still failed to prove beyond a reasonable doubt that he took a *substantial step* towards such commission. Because R.F. admitted that Appellant was still wearing pants when he thrust his hips up towards her while pulling her head down toward his crotch and saying, "give me head," Appellant maintains he did not take a substantial step toward the commission of the crimes for which he was convicted.

The trial court opines that the fact Appellant remained dressed at the time he forced himself on R.F. was not an impediment to a conviction for *attempted* IDSI and *attempted* sexual assault, for which no degree of penetration is necessary. Additionally, the court cites to decisional law where circumstantial evidence lacking exposure still sufficed to prove the substantial step element. **See Commonwealth v. Pasley**, 743 A.2d 521, 524 (Pa.Super. 1999) (affirming conviction for attempted sexual assault where evidence that defendant "threw the victim on his bed, straddled her, pushed up her shirt and bra to her neck, and attempted to unbutton her pants[,]" relenting only when the victim scratched and punched him proved beyond a reasonable doubt that he had taken a substantial step towards committing the crime); **Commonwealth v. Bullock**, 393 A.2d 921, 923 (Pa.Super. 1978) (substantial step towards IDSI by was demonstrated by evidence that a

defendant engaged in sexually illicit internet communications with a purported minor, planned to meet her the next day, indicated he would teach her oral sex when they met, and arrived at the prearranged location with condoms in his vehicle).

The trial court states similar circumstantial evidence that Appellant lured R.F. into his room on false pretenses, exploited his physical advantage to restrain her in order to initiate unwanted sex, and commanded her to undo his belt and perform oral sex until she broke free and kicked him supported the jury's guilty verdicts:

> R.F. testified that Appellant pinned her on her back, straddled her, pushed his knee into her thigh, and held her hands above her head. N.T. at 147-48. Once she could not move, Appellant kissed her and partially removed her shirt and bra, thereby exposing her left breast. N.T. at 152. He then "push[ed] [her] head towards his crotch . . . . [as] he was thrusting his hips in [her] face. ***Id***. Meanwhile, Appellant "grabb[ed]" at his belt and motion[ed] to [her] to unbuckle his belt." N.T. at 154. R.F. testified that Appellant continued to "buck[] his hips" toward her face and "kept telling [her]" that he wanted her to "do it." N.T. at 198.
>
> On cross-examination, [R.F.] testified that Appellant did not expose his penis or manage to unzip his pants or undo his belt. N.T. at 198. However, R.F. explained that during the incident, Appellant explicitly commanded her to "give [him] head[.]"
>
> . . .
>
> These facts are more than sufficient to sustain Appellant's convictions for attempted sexual assault and attempted IDSI by forcible compulsion. The most sensible inference that can be drawn from R.F.'s testimony (construed in favor of the Commonwealth as verdict winner) is that Appellant tried to force R.F. to give him oral sex, despite the obvious fact that she did not want to. In other words, Appellant specifically intended to engage in deviate sexual intercourse with the complainant. Moreover, it

was perfectly reasonable for members of the jury to conclude that by restraining the victim, ignoring her pleas to "stop," pushing his groin towards her face, forcing her head towards his penis, motioning to his belt buckle, and repeatedly demanding that she "do it," Appellant had taken a substantial step towards engaging in deviate sexual intercourse with the complainant. There is no other reasonable interpretation of such behavior.

Further, Appellant's actions were facilitated by his superior strength and protracted use of physical force. The fact that she begged him to stop and "thrashed" her body as she tried to break free clearly demonstrates that she did not consent to the encounter.

In fact, Appellant did not stop until she managed to free her leg and kick him. N.T. at 156. Thus, the elements of physical compulsion and lack of consent are also satisfied. *See Eckrote*, 12 A.3d at 387 ("[T]he Commonwealth must establish, beyond a reasonable doubt, that the defendant 'used either physical force, a threat of physical force, or psychological coercion' [to prove the element of forcible compulsion.]").

TCO at 38-40.

As we concur with the trial court's rationale, we conclude that Appellant's challenge to the sufficiency of the evidence is devoid of merit.

In Appellant's final issue, he argues that the second iteration of Pennsylvania's Sexual Offender Registration and Notification Act ("SORNA II")[6] may not be constitutionally applied in his case because it violates *ex post facto* laws as well as his rights to due process of law.

---

[6] In **Commonwealth v. Mickley**, 240 A.3d 957 (Pa.Super. 2020), this Court summarized the origins and iterations of SORNA, as follows:

SORNA was originally enacted on December 20, 2011, effective December 20, 2012. **See** Act of Dec. 20, 2011, P.L. 446, No. 111, § 12, effective in one year or Dec. 20, 2012 (Act 11 of 2011). Act

*(Footnote Continued Next Page)*

"[T]he constitutionality of a statute presents a pure question of law. Therefore, our standard of review is *de novo* and scope of review is plenary."

---

> 11 was amended on July 5, 2012, also effective December 20, 2012, *see* Act of July 5, 2012, P.L. 880, No. 91, effective Dec. 20, 2012 (Act 91 of 2012), and amended on February 21, 2018, effective immediately, known as Act 10 of 2018, *see* Act of Feb. 21, 2018, P.L. 27, No. 10, §§ 1-20, effective Feb. 21, 2018 (Act 10 of 2018), and, lastly, reenacted and amended on June 12, 2018, P.L. 140, No. 29, §§ 1-23, effective June 12, 2018 (Act 29 of 2018). Acts 10 and 29 of 2018 are generally referred to collectively as SORNA II. As our Supreme Court recently explained in **Commonwealth v. Torsilieri**, ––– Pa. ––––, 232 A.3d 567 (2020),
>
> > Act 10 split SORNA, which was previously designated in the Sentencing Code as Subchapter H, into two subchapters. *Revised Subchapter H applies to crimes committed on or after December 20, 2012*, whereas Subchapter I applies to crimes committed after April 22, 1996, but before December 20, 2012. *In essence, Revised Subchapter H retained many of the provisions of SORNA, while Subchapter I imposed arguably less onerous requirements on those who committed offenses prior to December 20, 2012*, in an attempt to address this Court's conclusion in [**Commonwealth v.**] **Muniz**[, 640 Pa. 699, 164 A.3d 1189 (2017)] that application of the original provisions of SORNA to these offenders constituted an *ex post facto* violation.
>
> **Id.** at 580 (emphasis added). Subchapter I was designed to ensure that those required to retroactively register under SORNA—and therefore entitled to relief following **Muniz**—will still have to do so

**Mickley**, 240 A.3d at 958. The **Mickley** court noted that because the defendant Mickley was convicted of offenses committed after December 20, 2012, Subchapter H applies and *ex post facto* principles have no application to his sentence. The **Torsilieri** Court refers to Subchapter H as Revised Subchapter H.

*Commonwealth v. Wade*, 33 A.3d 108, 115-16 (Pa. Super. 2011) (citation omitted). In addressing constitutional challenges to legislative enactments, we are mindful that:

> the General Assembly may enact laws which impinge on constitutional rights to protect the health, safety, and welfare of society, but also that any restriction is subject to judicial review to protect the constitutional rights of all citizens. We emphasize that a party challenging a statute must meet the high burden of demonstrating that the statute clearly, palpably, and plainly violates the Constitution.

*Torsilieri*, 232 A.3d at 575 (citations and internal quotation marks omitted).

While we adopt the trial court's opinion disposing of this issue, we make several observations. Initially, with regard to Appellant's *ex post facto* claim, it is undisputed that the reporting requirements applicable to a Subsection H offender like Appellant under Act 10, which was in effect at the time he committed his offenses, were retained in relevant, substantive part—with minor modification—several months later with the enactment of Act 29. Because Appellant fails to specify what changes substantively affected his registration requirements, let alone explain how they constituted additional punishment, he is entitled to no relief on this claim.

Appellant's due process challenge to the application of SORNA II to his case asserts that Subchapter H fails to individualize the assessment of dangerousness and instead applies an unconstitutional presumption of future dangerousness to all sexual offenders subject to lifetime registration.

Appellant, however, inadequately developed this issue both at sentencing and in the present appeal.

At Appellant's sentencing, defense counsel unilaterally elected to raise an oral motion for reconsideration of sentence in lieu of filing a written motion and requesting a hearing on the issues raised. His oral motion was confined to two discernable issues, namely, that application of SORNA II, Subchapter H to Appellant's case violated *ex post facto* laws (addressed *supra*) and violates due process rights by presuming future dangerousness without any individualized assessment that he will, in fact, pose a danger presently or for the entirety of his life.

As to the latter claim, the entirety of defense counsel's position was as follows:

> **Defense Counsel:** [T]his court is not given the opportunity to have individualized determination that this defendant is worthy of being—that suffering a lifetime of supervision and probation under Megan's Law. There is no determination that he's dangerous or that he will be dangerous for the entire future of his lifetime.
>
> And, . . . the presumption of future dangerousness, which is found in Subchapter H of Megan's Law, would violate due process of law. The only statute [under] which he can be compelled to register today is SORNA II, and that statute would be unconstitutional in its application. And we wish to put that on the record.

N.T. 10/21/20, at 70-72.

Recently, a decision of this Court provided a salient discussion of the significance of **Torsilieri** and its admonition on the importance of presenting

scientific evidence and research as part of a challenge against SORNA's presumption of future dangerousness:

> The *Torsilieri* Court addressed the constitutionality of Revised Subchapter H of SORNA, which applies to individuals who commit an offense after December 20, 2012.
>
> . . .
>
> In *Torsilieri*, the defendant challenged his registration requirements under Subchapter H in post-sentence proceedings. The trial court permitted the defendant "to introduce affidavits and supporting documents of three experts concluding that sexual offenders generally have low recidivism rates and questioning the effectiveness of sexual offender registration systems such as SORNA." *Id.*, at 574. After reviewing this evidence, the court found Subchapter H to be unconstitutional based on a myriad of theories, including that the registration and notification provisions of Subchapter H violated the defendant's "right to due process by impairing his right to reputation, as protected by the Pennsylvania Constitution, through the utilization of an irrebuttable presumption." *Id.*, at 574-575. The Commonwealth appealed.
>
> As mentioned in *Torsilieri*, "the test for an unconstitutional irrebuttable presumption requires three factors: (1) the existence of a presumption that impacts an interest protected by the due process clause; (2) a presumption that is not universally true; and (3) the existence of reasonable alternatives to ascertain the presumed fact." *Id.*, at 586 (citation and quotation marks omitted). There, the Court noted that a "review of the [trial] court's conclusions clearly reveals that the court's analysis of each of the three prongs of the irrebuttable presumption doctrine relies heavily upon the scientific evidence presented by [the defendant]." *Id.*
>
> As a result, the *Torsilieri* Court vacated the court's order which found Subchapter H to be unconstitutional. The Court declined to reach the constitutional challenge, but rather, held the record needed to be developed further based on following:
>
>> Given the procedures leading to this point, the importance of the underlying issue, and our deference

to legislative policy determinations, we decline to render a conclusion on the basis of the record before us. Instead, we conclude that remand is necessary to allow the parties to present additional argument and evidence to address whether a scientific consensus has developed to overturn the legislative determinations in regard to adult sexual offenders' recidivation rates and the effectiveness of a tier-based registration and notification system as they relate to the prongs of the irrebuttable presumption doctrine.

*Id.*, at 587-588 (citation omitted).

The Court further emphasized the following principles:

[W]e emphasize that all cases are evaluated on the record created in the individual case. Thus, a court need not ignore new scientific evidence merely because a litigant in a prior case provided less convincing evidence. Indeed, this Court will not turn a blind eye to the development of scientific research, especially where such evidence would demonstrate infringement of constitutional rights.

Nevertheless, we also emphasize that it will be the rare situation where a court would **reevaluate a legislative policy determination, which can only be justified in a case involving the infringement of constitutional rights and a consensus of scientific evidence undermining the legislative determination**. We reiterate that while courts are empowered to enforce constitutional rights, they should remain mindful that the wisdom of a public policy is one for the legislature, and the General Assembly's enactments are entitled to a strong presumption of constitutionality rebuttable only by a demonstration that they clearly, plainly, and palpably violate constitutional requirements.

*Id.*, at 595-596 (citation and quotation marks omitted).

Subsequently, in **Commonwealth v. Asher**, 244 A.3d 27 (Pa. Super. 2020), a panel of this Court addressed a similar Subchapter H challenge. There, even though the appellant properly preserved

the issue at sentencing and in his post-sentence motion, there was no factual record because **the trial court did not conduct an evidentiary hearing. The appellant's post-sentence motion was denied by operation of law.** The *Asher* Court, in accordance with *Torsilieri*, vacated and remanded the matter "for a hearing at which the parties can present evidence for and against the relevant legislative determinations discussed above." *Id.*, at 33 (citation omitted).

Turning to the present matter, in Elgaafary's post-sentence motion, he sought to modify his sentence based on the argument that SORNA's "internet notification provisions infringe[d] on [his] right to reputation without due process, and SORNA create[d] an irrebuttable presumption that all sex offenders pose a high risk of reoffending." Defendant's Post-Sentence Motions Filed Pursuant to Pa.R.Crim.P. 720, 12/27/2019, at ¶ 8. **He did not reference any studies or research to support his position. However, he did attach a proposed order to his post-sentence motion requesting a hearing. The trial court refused to entertain his request when the motion was denied by operation of law.**

This Court has previously found waiver where an appellant did not raise a *Torsilieri* unconstitutional irrebuttable presumption argument with the trial court but rather, presented the claim for the first time on appeal. *See Commonwealth v. Reslink*, ––– A.3d ––––, 2020 PA Super 289, 2020 WL 7415959 (Pa. Super. Dec. 18, 2020) (holding defendant waived his claim that Revised Subchapter H was based on an unconstitutional irrebuttable presumption by failing to raise it at sentencing or in a post-sentence motion).[7] **We decline to find waiver based on the circumstances of this case. Elgaafary set forth a colorable constitutional challenge, albeit in general terms, in his post-sentence motion.**[8] **Moreover, at the time Elgaafary filed his post-sentence motion, *Torsilieri* had not been decided**, **and the relevant caselaw at the time was in flux.** Accordingly, we conclude Elgaafary properly preserved the argument.

**Furthermore, because the court did not conduct a hearing, there is no factual record on which we can evaluate Elgaafary's SORNA irrebuttable presumption argument.** Therefore, in accordance with *Torsilieri* and *Asher*, we vacate

the order denying Elgaafary's post-sentence motion, and remand for an evidentiary hearing.

**Commonwealth v. Elgaafary**, No. 1178 EDA 2020, 2021 WL 4740958, at *7–9 (Pa. Super. Ct. Oct. 12, 2021) (emphasis added).[7]

In the case sub judice, defense counsel did raise the issue, albeit in general terms and summary fashion, when he opted to offer only an oral motion at the sentencing hearing. Therefore, we decline to apply waiver doctrine as was done in **Reslink**, where the issue was raised for the first time on appeal.

However, unlike in **Elgaafary** and **Asher**, where the relevant law was in flux at the time those defendants prepared their respective post-sentence motions, Pa.R.A.P. 1925(b) statements, and appellate briefs, Appellant's sentencing hearing took place three months *after* the **Torsilieri** decision offered guidance to defense counsel that legislation will be reviewed where constitutional infringement is shown by a consensus of scientific evidence undermining the legislative policy.

Yet, despite such guidance from our Supreme Court, defense counsel offered no scientific evidence before the trial court to support his contention that the SORNA II lifetime registration relies on an unconstitutional general presumption of lifelong dangerousness. Instead, he elected to declare at the sentencing hearing that he would offer only an oral motion—and thus forego

---

[7] Pursuant to Pa.R.A.P. 126(b)(2) (effective May 1, 2019): "Non-precedential decisions ... may be cited for their persuasive value."

preparing a written motion and seeking a hearing—which raised the present issue generally in a single sentence. Similarly, Appellant's appeal likewise fails to include any presentation or discussion of scientific evidence.

Therefore, because Appellant offered merely a bare assertion against SORNA II's legislative policy regarding lifetime registration despite having the benefit of *Torsilieri's* guidance three months prior to sentencing and nearly eight months prior to filing his brief in the present appeal, we decline to remand this matter to allow Appellant to develop the record on the issue of SORNA II's irrebuttable presumption on future dangerousness.

For the foregoing reasons, we affirm.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2021